F. D. WINGERT ET AL., Appellants, v. SNOUFFER & FORD
ET AL., Appellees.

F. D. WINGERT, ET AL., Appellants, v. CITY OF TIPTON,
Appellant; SNOUFFER & FORD ET AL., Appellees.

**Municipal corporations:** TEMPORARY INJUNCTION: NOTICE. A temporary injunction restraining a city from levying a special assessment and issuing certificates therefor, is not an interference with the ordinary business of the corporation within the meaning of Code, section 4359, requiring notice when such is the effect of the order sought.

**Inadequacy of bond.** Inadequacy of the bond is not ground for dissolving a temporary injunction, unless there is a failure to comply with an order for additional security.

**Dissolution of injunction.** The merits of a controversy will not be determined on a motion to dissolve an injunction.

**Street improvements:** FAILURE TO COMPLY WITH CONTRACT: EVIDENCE: INJUNCTION. One who contracts to perform the work of paving in accordance with certain specifications cannot, in default of compliance, recover on the contract; and abutting owners whose property is to be assessed on account thereof may enjoin the issuance of assessment certificates therefor.

Evidence held to show failure to comply with specifications.

**Same:** OBJECTION TO ASSESSMENT: ESTOPPEL. The question of compliance with a contract for street improvement is for the city council, and individual taxpayers are not estopped to object to an assessment of their property to pay the expense thereof, by reason of the fact that they failed to make objection to the character of the work as it progressed.

**Same:** An equitable estoppel bottomed upon silence does not arise unless there is a duty to speak and by failure to speak the other party, ignorant of the truth, is misled into doing something he would not have done but for such silence.

**Parliamentary law:** MOTION TO RECONSIDER. A motion to reconsider if carried leaves the original question precisely as it stood before the vote was taken, and in the absence of a special rule a motion to reconsider is carried by a majority vote notwithstanding the presiding officer may declare otherwise.

*Appeal from Cedar District Court.*— Hons. B. H. MILLER and W. G. THOMPSON, Judges.

TUESDAY, SEPTEMBER 25, 1906.

Rehearing denied Thursday, April 11, 1907.

ACTION in equity growing out of the work of improving certain streets in the city of Tipton, this State. The plaintiffs are owners of property abutting on such streets, and the demand of the petition is that an assessment levied by the city on their property to pay the cost of such work of improvement be declared invalid and set aside; further, that the city be restrained from issuing assessment certificates based on such assessment. A temporary writ was ordered and issued upon the filing of the petition. Before the trial of the main case on its merits, the temporary writ thus issued was dissolved on motion of defendants Snouffer & Ford — Judge Miller presiding. From the order thus made the plaintiffs appealed, and such is the matter involved in the appeal first above entitled. The main case coming on for hearing and trial — Judge Thompson presiding — there was a decree as against plaintiffs and the defendant city, in favor of defendants Snouffer & Ford, and therefrom the plaintiffs and the defendant city appeal. And such is the matter involved in the appeal second above entitled.— *Reversed.*

*I. J. Hamiel, France & Rowell, C. J. Lynch, W. N. Treichler, C. O. Boling,* and *F. J. Casterline,* for appellants.

*Redmond & Stewart* and *Wright, Leach & Wright,* for appellees.

BISHOP, J.— In December, 1902, a contract was entered into between the city of Tipton and Snouffer & Ford,

of the city of Cedar Rapids, by the terms of which the latter were to prepare for curbing and paving, and to curb and pave, certain streets in said city. The contract provides among other things that Snouffer & Ford, who are designated as the contractors, shall furnish all materials, labor, etc., to execute and complete the work in the best possible manner, and according to plans and specifications. That they shall employ only competent foremen, experienced mechanics, and laborers, etc. A further provision declares that the work shall be done under the supervision of a committee of the city council, consisting of three members, designated as a " Committee on Public Works," and this committee is authorized to appoint an inspector, whose duty it shall be to point out to the contractors any neglect or disregard of the specifications. It is said, however, that the right of final acceptance shall not be affected by such inspection. Further —

All materials furnished and work done will be inspected by the engineer (employed by the city), and if not in accordance with these specifications and the contract, they will be rejected, and shall be immediately removed and other work done and materials furnished in accordance therewith. . . . The contractor shall furnish all necessary facilities, should it be advisable to make any examination of the work already completed. If any be found defective in any respect, they shall defray the expense of such examination, and of satisfactory reconstruction. . . . The engineer shall have the right to reject, at any time previous to the final settlement with the contractors, any work or materials which may be found to be faulty. . . . No deviation from the plans and specifications will be allowed except by written authority of the engineer.

With respect to the materials to be used, and the manner of doing the work, the following provisions appear in the contract:

The subgrade of the roadway shall be of the depth of the paving, including foundation, after having been thor-

oughly compacted and secured from further settlement by flooding, ramming or rolling, etc. When graded and shaped in proper form, the street shall be thoroughly rolled with a steam roller until the subfoundation is compacted to the satisfaction of the committee. Any depression thereafter discovered shall be filled and the surface rerolled. On the subgrade shall be laid a foundation of cement concrete to a uniform thickness of four inches. In making the concrete an approved brand of Portland cement shall be used. The sand shall be clean, sharp river sand. The crushed stone shall be of the best quality of limestone. The cement, sand, and stone shall be thoroughly mixed in proportions as follows: One part cement, three parts sand, and seven parts stone. The concrete shall be deposited in a layer on the roadway in such quantity that after being rammed in place it shall be of the required thickness, true, and smooth, and five inches below and parallel with the top of the finished pavement. Upon the concrete foundation shall be placed a layer of clean sharp sand, free from loam and all foreign matter to a depth of two inches. Upon such sand layer, brick shall be laid, and the surface of the pavement shall then be thoroughly compacted by ramming or rolling so as to leave the street to the required crown and grade.

It is provided that upon the completion of the improvement a final estimate of the work done and materials furnished will be made immediately after the city engineer has satisfied himself by tests, examinations, or otherwise, that the work has been and is finally and fully completed in perfect accordance with the contract and specifications. Payments will be made on the completion of the contract and the acceptance of the work by the city council in assessment certificates based on assessments against abutting property to the extent that such assessments may be lawfully made; the balance to be paid in warrants drawn on the improvement fund of the city.

In their petition the plaintiffs set forth the contract in question, and they allege that the contractors claim to have completed the work contemplated thereby. It is then alleged that the materials used and the work done were not

in compliance with the contract, and that the pavement is inferior and worthless. Specifically, they charge that the subgrade was not prepared in accordance with the specifications; that an inferior quality of cement, sand, and stone was used for the concrete work; that as to the foundation there was a failure to use the required quality and quantity of materials prescribed, and a failure to properly mix and prepare such materials as were used; that the sand used for a layer or cushion was inferior in quality and deficient in quantity; that there was a failure to construct the paving to conform to the grade of the street, thereby leaving the surface uneven and irregular. It is then said that at a meeting of the city council, the committee on public works by two of its members, acting either negligently or in collusion with the contractors, reported the work contemplated by the contract as completed, and as satisfactory in every way and in accordance with the terms of the contract; that at such meeting the city engineer also reported the work as complete and in accordance with the plans and specifications, and submitted a plat and assessment list embracing the names of the abutting property owners, including plaintiffs, liable to assessment, and the amount to be assessed to each. Further, that upon the coming in of such reports the council passed a resolution approving the report of the committee, and accepting the improvement as satisfactory, and by a further resolution directed notice to be given of the time when objections would be heard and assessments levied. And it is said that such notice was given, and an assessment levied in accordance with the report of the engineer, and that, unless restrained, assessment certificates will be issued.

The defendants Snouffer & Ford answered the petition, denying all the allegations of fraud and failure on their part. In a cross-petition against the defendant city and its officers, they allege the completion of the work according to contract, and the approval and acceptance thereof by the city, and pray for an order requiring payment to be made in

manner and form as provided in the contract. The defendant city answered plaintiffs' petition, admitting the truth of the allegations of fraud and failure as charged against defendants Snouffer & Ford; denying that any assessment had been levied; and asserting that it was opposed to accepting the work in question as satisfactorily completed, and opposed to the levy of any assessment on account of said work. The city also answered the cross-petition of defendants Snouffer & Ford, denying that the work in question was ever approved and accepted by it; denying that the work was done and completed by said defendants in accordance with the terms of their contract; asserting that, on the contrary, the work was inferior both in material and workmanship; denying that any sum had become due to said defendants. It was in this situation that the motion of defendants Snouffer & Ford to dissolve the temporary injunction was presented to the court, and the ruling entered sustaining such motion. Thereafter further pleadings were filed by the respective parties, the averments of which will be sufficiently set forth as we proceed.

I. The motion to dissolve the temporary writ was put upon these grounds: (1) The writ was ordered and issued without notice to the defendants; (2) the bond required was inadequate in amount; (3) the allegations of the answer of the moving defendants are sustained, and the allegations of the petition are shown to be untrue, by the affidavits attached. Other grounds are embodied in the motion, but it is not contended that they were well taken. With the motion there was submitted to the court by defendants the affidavits of numerous persons tending to sustain their claim that the work of improvement in question was fairly in compliance with the contract. Also an affidavit showing that pursuant to the notice published by order of the council, several of the plaintiffs appeared and filed objections; some of them to the report of the engineer as to frontage; some of them as to the amount of the proposed assessment; and

some of them on account of the defective and inferior character of the work. The plaintiffs also submitted numerous affidavits tending to sustain their. claim that the work failed of compliance with the contract. The motion should have been overruled. In view of the result reached by us on the main case, it is not necessary that we go extensively into the reasons upon which our conclusion is based. An injunctional order at the suit of an abutting owner to restrain a municipal corporation from levying an improvement assessment, and the issuance of certificates based on such assessment, cannot be considered as having the effect to stop the ordinary business of the corporation within the meaning of Code, section 4359 as contended, for by the ordinary business of a municipal corporation is meant simply the matters coming within the exercise of those powers and functions conferred upon it by law which are beneficially incident to its existence and operation as a corporation. It does not extend to those matters where the city acts merely by appointment from the State, and in respect of which the beneficial interest is in the public at large.

1. MUNICIPAL CORPORATIONS: temporary injunction: notice.

. As to the bond there was no evidence that it was inadequate. Had there been, the injunction should not have been dissolved except upon the failure or refusal of the plaintiffs to comply with an order for additional security.

2. INADEQUACY OF BOND.

Coming to the third ground, it was clearly improper to proceed, intermediately upon a motion to dissolve, to an investigation of the merits of the case through the medium of affidavits. In the petition, plaintiffs charged a failure on the part of Snouffer & Ford to perform their contract; that, notwithstanding this, payment by the city through the issuance of assessment certificates was about to be made. The denial of the answer went no further than to put in issue the charge of failure to perform. Such being the situation, the motion

3. DISSOLUTION OF INJUNCTION.

to dissolve presented the same questions of equity as arose upon the answer, and hence amounted to nothing more than an attempt to obtain by summary action a decision as to the equity of the case.

II. Coming to the main case, it will be observed that both plaintiffs and the city make common cause against the defendant contractors on account of the character of the

4. STREET IM-
PROVEMENTS:
failure to
comply with
contract:
evidence:
injunction.

work done under the contract. And we may begin by saying that a full and careful reading of the record makes it clear that in many of the respects charged, and in substantial degree, the work of improvement failed of compliance with the contract. Indeed the court below did not find otherwise. It expressly appears in the record that the conclusion for a decree as entered was bottomed wholly upon other matters arising out of the issues as they presented themselves on final submission. To such matters our attention will be directed presently. We shall not attempt a detailed discussion of the evidence bearing upon the character of the work. Some twenty witnesses, residents of the city — and some of whom were workmen employed by the contractors — testified on the subject for plaintiffs, and almost with one voice they declare that the subgrade was very uneven — in some places three or four inches deeper than in others; that after the subgrade was prepared and rolled, hauling was done over it with wagons and in places cut up from two to six inches deep; that a considerable portion of the concrete foundation was put down in mud and water, in places ankle deep; that in some instances mud would show through the concrete; that in places the concrete was put in with but little and sometimes with no mixing; that the surface of the concrete was left rough and uneven; that after the concrete had been down for days, and, according to some of the witnesses, after two or three weeks, it was soft and " crumbly " in many places, so that holes could easily be dug therein with the hand or foot, and the broken stone loosened. One wit-

ness says that after the concrete had been down nearly two weeks a wagon loaded with sand was hauled over it, and the wheels cut through the concrete for a distance in length of nearly a block.    Another witness, a contractor and builder, engaged at the time in building in Tipton, testified that during the course of the paving work he purchased of the defendant contractors ten barrels of their cement; that about half of it was of excellent quality, and the other half was no good — sand would not make it stand or set it.    Without dispute, the sand used for a cushion was bank sand, and many of the witnesses describe it as a mixture of clear sand, clay, and soil.    Several give the proportion of the soil as from one-fourth to one-third.    A number of witnesses testify that the sand cushion as put in varied in depth from one-fourth of an inch to three or more inches, and one, a workman on the job, says that in several instances where, in leveling off the cushion, it was found that the concrete was higher than the grade of the cushion, enough sand was thrown over it with shovels to cover up the concrete, and the brick then put in place.    The attention of several witnesses was called to the character of the surface of the pavement, and they described it as uneven, with frequent depressions, wavy, etc.    And some of them testify that as time goes on the unevenness becomes more apparent.

As directly opposed to this mass of evidence, there is the testimony of three witnesses only introduced by the defendant contractors:  Geo. Patterson, their foreman, who was present and in charge of the concrete work; Robert Roberdee, one of the city committee on public works, and who acted as inspector by appointment of that committee; and J. D. Wardell, the engineer employed by the city. Patterson says that the materials used and the workmanship was in full compliance with the contract and specifications. On cross-examination, he admits that it was his first experience in putting in a concrete foundation for paving. Roberdee testifies that the work was put in and completed

in substantial compliance with the contract. Wardell, whose home was at Cedar Rapids, says that he had nothing to do with the inspection of the work in question as it progressed, but went up to Tipton on occasion as required to advise with the city officials in charge. Respecting his knowledge of the work, as of the time it was being done, he was asked on direct examination only as to the character of the sand used for cushion, and thereto he answered that at one time when present he found some of the sand unsatisfactory and recommended that it be taken out, " but the majority of the sand was satisfactory under the specifications." On cross-examination he says that on one occasion Roberdee told him of the method employed in measuring the cement, sand, etc. And, in effect, it is his testimony that he concluded that the proportion of cement used was short; that he advised a requirement for the use of a greater proportion. He also refers to another occasion when objection was made to the effect that the required amount of cement was not being used in places. And he says that as to one place which he examined he found that the specifications were not being complied with, and that he so informed the committee. Whether or not this information was followed by any change in the work does not appear. Between the time when the work was done and the time of the trial, several examinations of the pavement were made by civil and municipal engineers. These were procured to be made in part by the plaintiffs and the city, and in part by the defendant contractors, and the engineers were witnesses on the trial. One of these, a witness for the city, made an examination October 23, 1903, eleven days after the work was completed, and he says that the surface of the pavement was " irregular, pitted, uneven, and with depressions." He further says that, in his examination, he made sixteen openings in the pavement distributed over the entire area; that, as to the sand cushion, the sand was not sharp and clean — it contained some clay and foreign matter, and was not a

fair sand for that purpose; that the cushion varied in depth from one to four inches. As to the concrete, he says that in six of the openings the appearance was satisfactory, and he did not break through it. In the remaining places the concrete varied in thickness from two to four and one-half inches; that in quality it was poor, and he could not get a large piece intact. He further says that "concrete made as required by the specifications in question would have been satisfactory; that the surface would have been smooth, and the concrete hard so as to resist a pick."

In December of the same year, another engineer examined the work at the instance of the city. He says that the majority of the surface of the pavement was irregular; that at numerous places there were pits or depressions from one-half to three-fourths of an inch in depth, and, in some instances, from four to five feet in diameter. He made five openings into the pavement, each about two feet square, and he says that the sand cushion varied in depth from one to four and one-half inches; that he subjected a sample to a test, and found that it contained about 50 per cent. of clay and organic matter. Such a cushion, he says, "would cause unevenness and depressions in the pavement; it would settle after the roller or under traffic." As to the concrete, he says it varied in depth from two to four and one-half inches; that he failed to find a piece that would hold together; that in places the mud and dirt had worked up through; that in some cases there seemed to be almost an entire lack of cement, and in other cases the formation was nearly all cement. The witness says he made another examination in April following, when eleven openings were made in the pavement. From these it was disclosed that the sand cushion varied in depth from one inch to two inches; that the sand was finer and dirtier than ordinary bank sand; that there was clay all through it. As to the concrete, he says it varied in thickness from two and seven-tenths inches to four inches. These are excerpts from the further testimony

of the witness: " Concrete begins to set in from one to one and one-half hours. After several days it is safe to drive on it. We found in both examinations only two solid bits of concrete in which the cement was hard enough so that they could not break it out; instead of the rock breaking, it would part from the cement, showing an unevenness in mixing and spreading either a poor quality of cement or else a lack of cement. If mud becomes mixed with the concrete it will destroy its strength. I found evidence of mud having oozed up through the concrete, and it affected it so that you could break the concrete all in pieces with your fingers. I found some places where the concrete was of such poor consistency it looked like sand, and when I picked it up it fell to pieces. In some places there was too much cement and not enough sand; in others too much sand; and in others too much stone. It was not a uniform mixture. In my opinion two blocks [of the paving] in their present condition are no better than if made of common macadam and no cement at all."

Still another engineer made an examination of the pavement at the instance of the city, during the progress of the trial. As a witness, he says that the surface of the pavement was generally uneven; there are depressions where water would lie in pools from one-fourth to three-quarters of an inch deep. Further, he says that he made thirteen openings in the pavement, and found that the sand cushion varied in depth from one-half inch to two and one-half inches; that it was a mixture of pure sand, loam, and other foreign matter. As to the concrete, he says it varied in thickness from two and one-half inches to four inches. In most places he found it soft —" what you would ordinarily call dead mortar "— whereas, if put in according to the specifications, it should have been of that degree of hardness to resist a pick. " It would cause a pick to ring and have a live sound as rocks would have." He says that in several places he found that mud and black soil had worked up through the con-

crete, and in all such places the concrete was soft and brittle.  " I would say that the two blocks adjoining the courthouse square are no better than ordinary macadam having no cement at all; the block east is a trifle better, although very poor."

A building foreman in the employ of the general government at Rock Island arsenal, who had had extensive experience in the use of concrete, was a witness for the city. He says that he had examined the pavement in question and that the concrete is not good; it is rotten and dead; that in every place he examined except one the concrete can be crumbled by the hand. " Concrete made in proportions of one, three, and seven makes a solid mixture if properly handled."  One of the engineers testified that to cover the area called for by the contract it would require one thousand, one hundred and sixty-nine barrels of cement.  This was followed by evidence strongly tending to show that the number of barrels actually used was only about eight hundred and thirty.  It may be remarked in passing that no attempt was made by the contractors to show the number of barrels actually used by them.

The examination made at the instance of the contractors took place just previous to the trial.  It was participated in by five engineers — one of whom was Wardell — and thirteen openings were made in the pavement at various places. Wardell was called first as a witness.  He says that in ten of the openings the depth of the sand cushion varied from one inch to one and three-quarter inches, while in two the depth was two inches or over; that the quality was up to specifications.  He says that in seven of the openings the concrete was of the depth required by the specifications, and appeared to be good; in five of the openings it was short of the required depth.  On cross-examination he admits that the samples of concrete taken out from the five openings " was not as good as it ought to be; it was not what the specifications called for — full set concrete."  Being shown

a sample of concrete taken out by one of the engineers who examined for the city, he says, " I consider it very poor concrete. I think I found three or four samples like that shown me here. In the absence of some evidence that they were only local conditions at the five openings, I would not recommend the acceptance of the work." As to the surface of the street, he says that he went over it very carefully in the fall after the paving was done, and " did not find any of the depressions which I find now." In answer to the general question as to whether or not the job of paving work is in substantial compliance with the specifications, the witness answered, " There are some points that are not in strict compliance, but, in a general way, the specifications are complied with." Each of the other engineers confirmed the statements of Wardell as to what was found to be the conditions in the openings made, and each in answer to the general question expressed it as his opinion that the work was in substantial compliance with the specifications. Comment on the evidence thus set out is unnecessary. The contract of the city called for materials and work done according to specifications, and under the directions of an experienced foreman. It is evident that the finished work sought to be turned over to it, did not answer the requirements of the contract. That for such reason it was the right of the city to reject the work and refuse to make payment cannot be the subject of question.

III. Coming now to further matters presented on the trial, and upon the facts of which the decree was wholly predicated, the issue between the plaintiffs and the defendant

5. SAME: objection to assessment: estoppel.

contractors differs from that arising out of the cross-petition and the answer of the city thereto. And first as to the plaintiffs. In an amendment to their answer to the petition of the plaintiffs, the defendants Snouffer & Ford plead that all the matters complained of in respect to the character of the paving work was known to plaintiffs while the work was in process of con-

struction, and that they made no objection; further, that in response to the notice published pursuant to the resolution of the city council none of the plaintiffs appeared and filed objections addressed to the character of the work.   And it is said that out of this situation an estoppel arose in favor of defendants in the face of which plaintiffs should not be heard to insist upon the matters of defect and failure now pleaded by them to prevent payment being made under the contract. It is not easy to see how an estoppel could thus arise.   In the first place the individual property owners of the city cannot be held to a precise knowledge of the terms of the contract; the subject-matter was within the control of the city council, not only to make the contract, but to attend to its execution. And most certainly the individual property owners were under no obligation to stand about watching the work and make protest because of.this or that according to their individual interpretation of the contract.   The contractors were familiar with the provisions of the contract, and·they owed the duty to the city and to each individual taxpayer to execute the work according to such contract.   It would be a monstrous doctrine that would permit a recovery by them, notwithsanding conscious and flagrant violations of the contract, because, forsooth, some of the individual property owners, in passing by the work, observed the manner of its performance.   No case can be found in the books to countenance such a doctrine.

Moreover, that an equitable estoppel bottomed on silence may arise, there must be not only a duty to speak, but the silence must amount to a legal fraud in that thereby the 6. SAME. other party, ignorant of the truth, was misled into doing that which he would not have done but for such silence.   If both parties know the truth, there can be no estoppel by silence.   16 Cyc. 759; 11 Am. & Eng. Ency. 434.   But, if this were not so, the record before us makes disclosure of the fact that at various times different property owners, among whom were several of these plain-

tiffs, did point out and make protest against the character of
the materials used and of the work being done.

IV.   As we have seen the cross-petition of the contrac-
tors against the city goes no farther than to allege the com-
pletion of the work by them, and the approval and acceptance

7. PARLIAMENTARY
LAW: motion
to reconsider.

thereof by the city.   In an amendment there
is alleged a demand in writing upon the city
to proceed with the assessment and levy
against the abutting property, and the issuance of certificates
and improvement fund warrants as provided for in the con-
tract.   And it is said that the city and its officers have failed
and refused to comply with such demand.   A mandatory
order is prayed, and such is granted by the decree.   Answer-
ing the amendment, the city reiterated its denial that the
work had been performed and completed according to con-
tract, and its denial that such work had been approved and
accepted.   In view of what was said by us in *McCain v. City,*
128 Iowa, 331, it may be doubted if an approval and accept-
ance by the city council, if such there was, could avail the
contractors anything as against the plaintiff property own-
ers.   And a decree in their favor would of course operate as
a decree in favor of the present contention of the city.

But according to our reading, there was no approval and
acceptance of the work by the city.   The records of the city
council were brought in, and therefrom it was made to appear
that at the meeting in question there was present the mayor
and five out of the six councilmen of which the council was
composed.   Upon the resolution to approve and accept, the
yeas and nays were called, and three councilmen voted yea,
and two nay.   Thereupon, and before the announcement of
the result, the two councilmen voting nay changed their vote
to yea, stating at the time, and it being so entered in the
record, that this was done for the purposes of a motion to
reconsider, to be acted upon at the next meeting when all the
members could be present.   The record of the vote was then
entered — yeas five, nays none.   A motion was then made

and seconded that the vote by which the resolution was adopted be reconsidered, and this motion was carried over to the next meeting. At the subsequent meeting there was present the mayor, and five councilmen; one of the members having in the meantime become a non-resident of the city, and his office having been declared vacant. The motion to reconsider was called up and put to a vote, resulting in three yeas and two nays. The mayor declared the motion lost, whereupon an appeal was taken, resulting in two votes to sustain and three to overrule. The mayor declared "the appeal was lost." It is a well-settled rule of parliamentary law that a motion to reconsider, if allowed, operates to abrogate the effect of the vote in question, "and the matter stands before the assembly in precisely the same state and condition, and upon the same question, as if the vote which has been ordered to be reconsidered had never been passed." Cushing's Manual, section 1265. And in the absence of a special rule on the subject, a motion to reconsider is to be regarded precisely like any other motion; it is allowed if a majority vote in favor thereof. Id. section 1266. It is immaterial that the mayor, in announcing the vote on the motion to reconsider, declared the same to have been lost. An erroneous, arbitrary announcement cannot have the effect to nullify the act of the majority of the city council. *Chariton v. Holliday,* 60 Iowa, 391.

No other questions are presented which require discussion at our hands. From what has been said, it follows that a reversal must be ordered upon both appeals.— *Reversed.*