C. E. ATKINSON, Appellee, v. CITY OF WEBSTER CITY, Appellant. .

MUNICIPAL CORPORATIONS: Public Improvements—Assess-
1 ments—Objections—Sufficiency. Objections to a proposed assessment for paving and curbing reviewed, and held, as a whole, sufficiently specific to justify the annulment of the assessment, especially where the nonsufficiency of the objections was not interposed to the reception of the evidence. (Sec. 824, Code, 1897.)

MUNICIPAL CORPORATIONS: Public Improvements—Assessments
2 —Objections—Amendments—Fraud. Fraud in the construction of a public improvement, discovered for the first time during trial in the district court on the property owner's objections to the assessment, *opens the door to amendment* to his objections filed with the city council. So held where the property owner discovered during such trial that the paving was only some two inches in thickness, in total disregard of the specifications. (Sec. 824, Code, 1897.)

MUNICIPAL CORPORATIONS: Public Improvements—Bids—Con-
3 tract on Secret Modification of Bid. A contract for a public street improvement, not let "to the lowest bidder *by sealed proposals*," but by private negotiations with the contractor after the bids were opened, is illegal. Sec. 813, Code Supp., 1913, requiring such contracts, when let, "to be to the lowest bidder by *sealed* proposals," is mandatory. So held where the contractor, after the bids were opened, and at a time when only he and the council were present, modified his opened bid by substituting a *higher grade* of paving for the same price bid by him on a *lower grade*.

MUNICIPAL CORPORATIONS: Public Improvement—Assessment
4 —Substantial Compliance with Contract—Bond—Effect. Substantial compliance with the contract for a public street improvement is a condition precedent to the right to assess abutting or adjacent property therefor, even though the contractor does give a guaranty bond to keep in repair and make good any defects for a five-year period.

**MUNICIPAL CORPORATIONS:** Public Improvements—Assessments
—Estoppel to Object. Record reviewed, and held insufficient to estop a property owner from objecting to an assessment on his property because of having inspected and made objections to some of the work during construction.

**MUNICIPAL CORPORATIONS:** Public Improvements—Substantial Noncompliance with Contract Followed by Acceptance—Effect. Approval by a city inspector of the work constituting a public street improvement, and a later acceptance of the work by the city, *when there has been a substantial failure to comply with the contract,* is a fraud on the property owner and, manifestly, is not conclusive on him.

**MUNICIPAL CORPORATIONS:** Public Improvements—Substantial Compliance with Contract—Evidence—Sufficiency. Substantial performance of a contract for a public street improvement exists when the omissions or deviations from the contract are inadvertent or unintentional, are not due to bad faith, do not impair the improvement as a whole, are remedial without doing material damage to other parts, and may without injustice be compensated for by reduction from the contract price. Evidence reviewed, and held to show affirmatively that a paving and curbing contract was not substantially complied with.

*Appeal from Hamilton District Court.*—R. M. WRIGHT, Judge.

THURSDAY, JUNE 29, 1916.

REHEARING DENIED SATURDAY, SEPTEMBER 30, 1916.

THIS is an appeal from special assessments imposed upon a lot of the plaintiff's for paving, curbing and guttering the street upon which said lot abuts, known as Willson Avenue. The assessment for paving was in the sum of $200.95, and for curbing and gutter, $41.93. Separate appeals were taken from each assessment, but the two were consolidated and tried as one case in the district court. The case was tried as in equity, and the district court entered a decree annulling and canceling both the assessments and taxed the costs of the trial to the defendant city. It is from this decree and judgment that the defendant has appealed.—*Affirmed.*

*D. C. Chase, E. P. Prince* and *J. W. Lee,* for appellant.

*Wesley Martin, O. J. Henderson, I. R. Meltzer* and *C. G. Lee,* for appellee.

PRESTON, J.—The questions presented are largely of fact, and there is a voluminous record and a large number of exhibits have been certified.  These exhibits include the original specifications, samples of the pavement, gravel, etc.  We shall not attempt to set out the evidence at any considerable length, but shall state the claims of the parties and our conclusions.  No formal pleadings were filed in the district court, but the issues as tried were the objections filed by plaintiff before the city council.  The objections to the paving assessment were substantially as follows:

"1.  That said assessment is inequitable, unjust, and largely in excess of the benefits derived therefrom.

"2.  That said improvement was not ordered and made as provided by law. .

"3.  That said assessment is invalid for the reason that no valid contract was let or entered into by the said city for the construction of said improvement.

"4.  That the alleged contract under which said improvement was constructed was not a legal contract for the reason that the same was not let to the lowest bidder on a sealed proposal, but said contract was entered into by the city by a private negotiation with such contractors, and not upon open and competitive bidding, as by statute required.  That said contract was and is void, and the proposed assessment against the property of this objector is invalid.

"5.  That the council allowed the contractors who constructed said improvement to change the bid after the bids upon said improvement had been opened and rejected by the council, and the contract so entered into was not let by the city to the lowest bidder on sealed proposals, as by statute required.

"6.  That said improvement was not constructed accord-

ing to specifications, or according to the alleged contract entered into by the said city and said contractors, in the following respects, among others:

"(a). In that the subgrade was not prepared as said specifications required.

"(b). In that the concrete foundation was not of the material required by said specifications.

"(c). In that the concrete foundation was not laid on subgrade as required by said specifications.

"7. That the cost of construction of said improvement for which said assessment is made against the property of this objector, includes items not lawfully included therein, and is excessive and unlawful."

The objections were amended upon the trial, to conform with the proof, as follows:

"Now comes the appellant, C. E. Atkinson, and amends his objections to the manner in which the contract was performed on Willson Avenue, and his objections to the paving thereon, to conform with the proof, and amends the sixth objection by adding thereto: Division D. And stating that the concrete foundation for said pavement was not of the thickness required by said specifications and did not comply with the said specifications in that the same was not four inches thick; that the fact that the same did not comply with the specifications was concealed from the plaintiff and not discovered until after the trial of this case; that the evidence shows the facts under which said foundation was laid, and it conclusively appears that the contractor and the city officials were guilty of fraud in laying or permitting the same to be so laid, and permitting the same to be covered and reporting the same as having been laid in compliance with the plans and specifications."

The objections filed to the curb and gutter assessment were substantially in this form:

"1. That said assessment is inequitable, unjust, and largely in excess of the benefits derived therefrom.

"2. That said improvement was not ordered as by law provided.

"3. That no valid contract was ever let or entered into by said city for the construction of said improvement.

"4. That said curb and gutter were not constructed according to specifications, or according to the alleged contract entered into by said city with the contractors constructing the same, in the following respects, among others:   (a) That the material used for the foundation of said curb and gutter was not of the quality required by said specifications. (b) That the concrete used in the construction of said curb and gutter was not mixed as required by said specifications. (c) That the concrete was not placed in layers as said specifications require."

As to the paving, it appears that, in the year 1913, the city of Webster City paved Willson Avenue. No question is raised on this appeal as to the preliminary resolution. The plans and specifications for the pavement provided, among other things, for a third kind of pavement, designated "asphaltic concrete pavement." Quoting, the specifications read as follows:

"These specifications provide for two distinct classes of asphaltic concrete pavement, designated as Class A and Class B. Contractors may bid upon either or both classes as they may desire."

Class A provides for the use of artificial asphalt. Class B required the contractor to use refined Bermudez Lake asphalt. Class B provides for a better grade of asphalt than is required by Class A, and a more expensive paving.

The notice to contractors inviting sealed proposals distinctly specified the two classes of asphalt paving. The sealed proposal of Zitterell & Sullivan, who constructed the paving, contained a bid upon both classes of asphaltic paving. By such sealed proposal they offered to construct the Class A asphalt paving for $1.71, and the Class B asphalt

paving for $1.76. Their proposal as to the asphaltic construction is as follows:

"No. 4 for asphaltic concrete pavement, Class A, per square yard $1.71. No. 5 for asphaltic concrete pavement, Class B, per square yard $1.76."

Their sealed proposal on these classes of work was the lowest proposal submitted. The proposals of the various bidders, including one of Zitterell and Sullivan, were opened by the city council on the evening of June 4, 1913. The council did not see fit to let the contract upon the bids submitted on that evening, and adjourned, to meet the next evening, without making any record upon the subject.

The next evening, June 5, 1913, Zitterell & Sullivan met with the city council and filed with the council a modification of their sealed proposal, by which they offered in writing to construct Class B asphalt paving, for which by their sealed proposal they were asking $1.76, for the sum of $1.71. This written proposition of Zitterell & Sullivan is as follows:

"To the Mayor and City Council of Webster City, Iowa:

"In reply to your inquiry as to the kind of asphalt we propose to use in case we are awarded contracts for paving on Seneca Street, Willson Avenue and Des Moines Street, under Class A on our bid of $1.71, we desire to say we expect to use Bermudez Pitch Lake asphalt, and we hereby bind ourselves to use the same.

"June 5, 1913.            Zitterell & Sullivan,
                           "J. G. Sullivan."

After said written proposition was submitted, the city council awarded the contract for the said paving to Zitterell & Sullivan at $1.71 per yard, and entered into a written contract with the said Zitterell & Sullivan whereby it was agreed that they should construct a paving in compliance with the specifications for the third kind of paving designated as Class B; that is, requiring the contractor to use natural asphalt as distinguished from artificial asphalt. This modified proposal

was filed by Zitterell & Sullivan on the evening of June 5, 1913, when no one was present but the members of the council and said contractors, and was immediately acted upon by acceptance.

It is the contention of the plaintiff that, because of the foregoing facts the contract for the paving was void, in that the same was not let "by sealed proposal," as required by statute. This contention is raised by objections filed before the council, numbered 2, 3, 4 and 5 of plaintiff's objections. It is further the contention of the plaintiff in his objections that the contract was not performed in compliance with the specifications:

(1)  Because the subgrade was not prepared as said specifications required. The specifications provided:

"No plowing will be allowed within two inches of the subgrade, and the proper grade must be obtained by use of mattocks and shovels and other suitable tools. No earth shall be removed below subgrade, and any earth taken out below subgrade shall be replaced at the expense of the contractor by sand or gravel; anywhere sand or gravel are used they shall be thoroughly dampened and tamped in layers not exceeding six inches, immediately before placing the concrete."

Said specifications further provide:

"In hot weather, or where the subgrade is dry, the contractor shall thoroughly moisten the same immediately before spreading the concrete and to the satisfaction of the engineer."

The foregoing provisions were disregarded by the contractor. There is evidence to show that not only was this a material specification so far as the resulting quality of the pavement is concerned, but that it was a material item in the cost of construction. The evidence shows that the contractor would plow not only within two inches of the subgrade, but at times five or six inches below the subgrade. They would then fill back to subgrade with soil and dirt

taken from other portions of the street. The contractor did not moisten the subgrade before spreading the concrete. During a part of the construction work, the weather was very hot and dry, and, instead of moistening the subgrade, they poured the concrete into the dust, the result of which was to absorb the moisture out of the concrete and mix the dust with the concrete. On other parts of this construction work, after some heavy rains that then occurred, they poured the concrete directly into the mud, resulting in the wheels rolling the mud into the concrete as it was dumped. When these contractors would cut below the subgrade, they would fill back to subgrade with dirt, instead of sand and gravel as the specifications required, and no attempt was made to tamp even the dirt thus substituted. This dirt was taken from the excavation in other parts of the street, thus saving the hauling in of the required sand and gravel. The testimony shows that a moistening of the subgrade as the specifications required would affect the contract price at least one-fourth cent per square yard, and the expense of hauling in the necessary sand and gravel.

(2) That the concrete foundation was not of the material required by said specifications.

By an insert in the specifications, crushed rock for the concrete foundation was not to be of the commercial character and quality. Quoting from the specifications, they read as follows:

"Broken stone shall be of approved quality of hard rock with no fragments larger than will pass through a 1¾ inch ring, and none smaller than will pass through a ¼ inch ring in their longest dimensions, free from all refuse and foreign matter and well graded."

The original specifications have been certified to this court, from which it appears that this requirement was a modification of the standard specification, and required a special kind of crushed rock. From the testimony of some

of the witnesses, it appears that commercial crushed rock is rock that will pass through a 2 inch ring and be caught by a ⅛ inch ring. Rock of the character required by the specifications would have to be prepared especially and is more expensive. It is claimed by appellee that no attempt was made on the part of the contractors to comply with this especially prepared specification, nor was any attempt made on the part of the engineer to exact it. Of the crushed rock used, from 15 to 20 per cent was particles that would pass through a ¼ inch ring, and from 5 to 10 per cent was too large to pass through a 1¾ inch ring. The plaintiff has had certified some exhibits from the foundation of this paving, and it appears from an examination of them that some particles are more than 2½ inches in their longest dimensions. This specification materially affected the contractor's bid.

The plaintiff, at the close of the evidence, raised the further objection that the concrete foundation was not of the thickness required by the specifications, and states that this fact was not discovered by him until during the trial. This amended objection made at the close of the evidence is as follows:

"Now comes the appellant, C. E. Atkinson, and amends his objections to the manner in which the contract was performed on Willson Avenue, and his objections to the paving thereon, to conform with the proof, and amends the sixth objection by adding thereto: Division D. And stating that the concrete foundation for said pavement was not of the thickness required by said specifications and did not comply with the said specifications in that the same was not four inches thick; that the fact that the same did not comply with the specifications was concealed from the plaintiff and not discovered until after the trial of this case; that the evidence shows the facts under which said foundation was laid, and it conclusively appears that the contractor and the city officials were guilty of fraud in laying or permitting the same to be so

laid, and permitting the same to be covered and reporting the same as having been laid in compliance with the plans and specifications.''

The foundation was put in and covered, and plaintiff did not discover the fact of its thickness until, during the trial, the defendant tore up a cross-section of the pavement in front of the plaintiff's house. This cross-section was inspected by the trial court. Little, if any, of this foundation was 4 inches thick, and much of it did not exceed a thickness of 2½ inches. Slabs taken from this foundation were introduced upon the trial, identified and preserved, and certified to this court for inspection.

As to the curb and gutter, it appears that the contract for the curb and gutter was let at the same time as the contract for the paving. The contracts, however, were separate, and the proceedings with reference to the improvement were separate. Separate proposals were made for the work. The contract, however, was let to the same contractors, Zitterell & Sullivan. The objections to the curb and gutter have been set out. These objections were presented to the city council prior to the time the assessment was fixed and confirmed, and at the same time the objections to the paving assessment were presented to the city council.

It is first contended that no valid contract was ever let or entered into by the city for the construction of said improvement, or said curb and gutter. The specifications provided by red ink insert:

''Upon the subgrade shall be placed a foundation of coarse gravel six inches deep after compacting. Said foundation must be thoroughly wetted, and compacted before the concrete is placed thereon, all gravel to be larger than ¼ inch.''

It appears from the testimony of the contractors' superintendent, Mr. Cox, and the plaintiff, Atkinson, that, prior to the letting of the contract, there was an arrangement between

the engineer and Zitterell & Sullivan, bidders, that if they secured the contract he would interpret said provisions inserted in red ink in the specifications to mean that gravel mixed with 20 per cent sand smaller than minimum size provided for in the specifications might be used. Under this, the contractor might use a less expensive material in the performance of said contract than the specifications required and a less efficient material, and it appears that said contract was let by the city after such understanding between the proposed contractors and the city engineer, and no attempt was ever made to carry out the requirements of the ·specifications in this respect, and the requirements of this understanding were not performed. It was shown that the curb and gutter were not constructed according to the contract entered into by said city with the contractors constructing the same, in the following respects:

The material used for the foundation of said curb and gutter was not of the quality required by said specifications. Samples of the material were preserved by the plaintiff prior to the time the foundation for the curb and gutter was laid, and were produced upon the trial. Plaintiff protested against the use of this material to the mayor, chairman of the street and alley committee, city engineer, the contractors and contractors' superintendent. During the trial, excavations were made under the ·curb and gutter, and samples of the alleged gravel foundation produced at the trial. These exhibits have been certified to this court, and show that the material for the foundation of the curb and ·gutter was not such as required by the specifications, and show, we think, that even the material used was not the kind discussed or agreed upon between the engineer and the contractor before the letting of the contract and agreed upon by them as a substitute. The evidence shows that not to exceed 60, and sometimes not to exceed 20 per cent of the material used would comply with the specifications as to the use of gravel.

It further appears that river wash gravel reduced the expense of constructing the curb and gutter about four cents per foot, and appellee claims that, had other contractors known that the substitute was acceptable, their bids could have been reduced accordingly. It appears that the next lowest bidder for the contract of curb and gutter in this case was only two cents per linear foot higher than the successful bidders, Zitterell & Sullivan, and that such bidder, being the plaintiff, bid upon the specifications, and, had he known of a modification, could and would have reduced his bid four cents per foot.

The concrete used in the construction of said curb and gutter was not mixed as required by said specifications. The specifications required the cement, sand and gravel to be thoroughly mixed, in a dry state, and then further mixed after being wetted. The contractors did not follow this provision of the specifications, but wet the ingredients before mixing. This was a cheaper process and resulted in a saving to the contractors. The requirement enhanced the amount of the bid. The substitute reduced the cost to the contractors. Again, the specifications required that the concrete should be composed of one part cement to three of sand and gravel. Two witnesses testify that by actual measurement the mixture was one of cement to between three and a half and four and a half of sand and gravel. Sand and gravel is cheaper material than cement, and a weaker mixture produces a poorer job. Again, the specifications provide:

"The concrete is to be composed of one part Portland cement to three parts of perfectly clean gravel, containing sufficient well graded sand to fill the voids. No gravel shall be larger than one-half inch in any dimension, and the proportion of fine and coarse material shall be satisfactory to the city engineer."

Plaintiff produced and identified upon the trial a sample of the material used as a substitute for the clean gravel and

sand provided for in the specifications just referred to. This exhibit has been certified to this court. This exhibit and the testimony show that much of this material is larger than a half inch in its largest dimensions. It is not clean, and it is not well graded. This substitute cost about half what the material called for in the specifications would cost. From the entire record, it will appear that some of the substitutions were not accidental, but conscious and intentional. The concrete was not placed in layers, as the specifications required. To construct the curb and gutter in layers, as required by the specifications, would enhance the cost of the construction. The concrete work was not kept covered and moist, as by said specifications required. The gutter and curb were constructed in July and August of 1913. The curb and gutter were not kept covered, nor were they kept moist. Under the evidence, it is essential to a good job that these requirements of the specifications be complied with. A failure to comply with this requirement enhances the profit of the contractor.

The city council gave notice to the property owners whose property would be assessed for these improvements, inviting them to file objections to the proposed assessment. This plaintiff filed his objections. At the time set for the hearing of these objections, the plaintiff appeared before the council in person to urge these objections. The contractors were in attendance at this session of the city council, and when plaintiff arose to make his objections, as he did several times, he was interrupted to such an extent that he was unable to proceed. Upon this point, a witness testifies:

"I was present at the meeting at the city hall when Mr. Atkinson tried to make his oral objections. . . . I heard Mr. Atkinson start to make his objections. He arose to make his oral objections and was frequently and repeatedly interrupted. These interruptions came from the north side of the room. My recollection is from Mr. Zitterell, one of the contractors. There was no attempt made on the part of the

mayor or council to quell the interruptions, to my knowledge. I can't recall the language of the interruptions but it was sort of a 'ha! ha!' and that was true each time Mr. Atkinson tried to speak. My best recollection would be that he tried three or four times. Quite a large crowd was present. Mr. Atkinson did not sit down between interruptions, he would stop and wait a minute or two, and then start again. There was no attempt, as I recall it, to have quiet while he was offering his objections. The mayor sat between Mr. Zitterell and myself.''

Following this, the assessments were approved. The record shows that thereafter the contractors presented the members of the council, the mayor, the city engineer, the city attorney, and the inspector, each with a turkey. Upon this point, one of the contractors, J. G. Sullivan, testified:

''Following the completion of that job, we sent out some turkeys to different people at Christmas time. . . . My recollection is that we sent them out to all the city officers; by my order they were sent to every member of the city council. My orders were to send one to the mayor. The city engineer was included among the list.''

During the trial, the court inspected the improvement generally, and the points also where the samples introduced in evidence were obtained.

Zitterell & Sullivan were the lowest bidders. Plaintiff is a contractor, and was an unsuccessful bidder. The contract called for 6,074 linear feet of combined curb and gutter, and there were 935.6 cubic yards of pavement. The work was done under inspection of a person appointed for that purpose and was supervised by the city engineer, and later accepted by the city council by formal resolution. It is claimed by appellant that it is shown that the material for the concrete foundation and for the mixtures was according to specifications; that, after a year from the completion of the work, and after one season of freezing and thawing, there was no evidence of poor material or workmanship or cracking of the

curbing, gutter or pavement; that measurements were made from time to time by the inspector as the work progressed, and that the inspector testifies that the material was of the quantity and quality called for by the contract and specifications; that other witnesses pronounced the work and material good and substantially as specified; that the work was of some value; that there was no evidence of fraud or collusion.

There is a conflict in the testimony at some points, but the trial court saw and heard the witnesses, and, as we understand the record, personally inspected the improvement, and, after a reading of the record, we are satisfied with the conclusions of the trial court, where there is a dispute in the testimony.

1.  It is claimed by appellant that, under the decisions, the objections made by appellee before the city council were not sufficiently definite and specific to advise the council of the matters relied upon, and that appellee is confined to the objections made before the council, and others are waived. Some of the objections may not be sufficient, taking each one by itself, but some of these are elaborated upon by later objections on the same subject; for instance, objections 2, 3, 4 and 5 should be considered and construed together on one point. We think the objections are sufficiently specific, at least as to some of the matters now relied upon, and sufficient of them to justify the trial court in annulling the assessment. Furthermore, the objections certified by the council to the district court upon appeal constitute, in a sense, the pleadings and the issues, where no other pleadings are filed. The defendant objected to the objections when they were offered in evidence, but the evidence of the witnesses was not objected to because not relevant, or upon the ground that the objections were not sufficiently specific.

1. MUNICIPAL COR-PORATIONS: public improvements: assessments: objections: sufficiency.

2.  It is also contended by appellant that the objections

filed before the city council may not be enlarged or amended at the time of the trial. This is the general rule, but the Code, Section 824, provides that all objections to errors, irregularities or inequalities in the making of said special assessments, or in any of the prior proceedings or notices, not made before the council at the time and in the manner herein provided for, shall be waived, except where fraud is shown. Appellee contends that the evidence shows that the concrete foundation for the pavement was not of the thickness required by said specifications and did not comply therewith, in that the foundation was not four inches thick, and that the discrepancy in thickness was so great as to constitute a fraud, and that this was not known to him and could not have been discovered until the pavement was cut up and the evidence introduced on the trial. And the claim is that, as this was not known at the time the objections were filed, he has a right under the statute to file amended objections when the fraud is discovered. We think this is the meaning of the statute, and that under the record there was at least constructive fraud, if, indeed, there was not actual fraud in regard to this and some of the other matters complained of.

2. MUNICIPAL COR-
PORATIONS: pub-
lic improve-
ments: assess-
ments: objec-
tions: amend-
ments: fraud.

3. The plaintiff contends that the contract under which the improvement was constructed was not a legal contract, for the reason that the same was not let to the lowest bidder on a sealed proposal, but was entered into by the city by private negotiations with the contractors. The appellee's contention is that, because of the substitution of a different class of asphalt after the bids were received and before the contract was let, the statute was not complied with; and he claims that the provisions of the statute are mandatory and must be strictly construed in favor of abutting owners, and that, if this is not done, the city has no jurisdiction to proceed. In the original argument, appellant seeks to meet this objection by the argument that, because a better class or

3. MUNICIPAL COR-
PORATIONS: pub-
lic improve-
ments: bids:
contract on se-
cret modification
of bid.

grade of asphalt was substituted, plaintiff therefore has no just cause for complaint.

In a supplemental argument, the claim is made that there are three different kinds of asphalt under Class A, upon which the contractors bid at $1.71 per square yard. But as to this last proposition, the fact remains that, after the bids were opened and before the contract was awarded, the other class, that is, Class B Bermudez Lake asphalt, upon which the contractors bid $1.76 per square yard, was substituted. It may be that, in a particular case, the substitution of a better quality of material would not work any prejudice to the property owners of the city, but there are two or three difficulties in regard to this matter. In the first place, the other bidders did not have the same chance as was given the successful bidders. In the next place, the procedure adopted in this case ignores the plain provision of the statute. Furthermore, it does not necessarily follow that, because a higher grade of asphalt was substituted for a lower grade, the city or property owner was benefited. A case could readily be imagined where there might be a combination between bidders representing the two classes, in which the bid on the better grade would be so high as to justify the substitution of the better grade at the price of the lower; then, after the contract was let, the bidders could arrange the matter among themselves. The question is whether the city council had a right under the statute, after inviting sealed proposals for a public improvement which is to be paid for by special asssessment against the abutting property, to enter into a contract at variance with the sealed proposals. The statute provides (Code Supp., 1913, Section 813):

"All contracts for the making or reconstruction of street improvements and sewers shall be let in the name of the city, to the lowest bidder, by sealed proposals, upon giving notice," etc.

It will be noticed that, under the provisions of the statute, the terms "to the lowest bidder," "by sealed proposals," and

"upon giving notice . . ., but all bids may be rejected and new bids ordered," etc., are separated by commas. It is plain, we think, that a proper interpretation of these provisions is that all contracts for the making of street improvements shall be let "to the lowest bidder;" second, that all contracts for the making of street improvements shall be let "by sealed proposals;" and third, that all contracts for the making of street improvements shall be "upon giving notice," etc. If the city may not let a contract except to the lowest bidder, by sealed proposals, we think the council has no power to let the contract as was done in this case by what is, in effect, private negotiation between the successful bidders and the city, in the absence of other bidders, and without their knowledge, and after the other bids have been opened. The council had the right, under the statute, to reject all the bids and order new ones and in that way give the other bidders the same opportunity as the successful contractors in this case had, and possibly to the benefit of the city, by reason of further competition. The object of such provisions is to prevent favoritism, corruption, extravagance and improvidence in the awarding of municipal contracts, and they should be so administered and construed as to fairly and reasonably accomplish such purpose. 20 Am. & Eng. Encyc. (2d Ed.) page 1165. See, also, *Chippewa Bridge Co. v. City of Durand,* 106 Am. St. Rep. 931, at 937; *Fairbanks v. City of North Bend* (Neb.), 94 N. W. 537.

In the *Chippewa Bridge Co.* case, supra, at page 943, it was said:

"It may be that, in the particular case, the methods adopted by the city officials to procure the bridge were advantageous to the public; but that does not help the matter. The charter having prescribed how such contracts must be made, having mapped out, expressly or by implication, a particular plan to be followed in order to prevent dickering, which, if allowed in such matters, is liable to result in favorit-

ism, extravagance or corruption, the municipal officers were under an absolute disability to proceed in any other way.''

The city council, in providing improvements of this kind, acts as an agent of the taxpayer and abutting owners, but without consulting them; hence the necessity of the rule that the statute empowering them must be strictly construed. The council is not vested with an arbitrary and unlimited discretion, but must exercise a *bona fide* judgment. Before letting a contract to the lowest bidder, the members of the council should have believed that such bid was the lowest reasonable bid that could be obtained. The difference in the two classes of asphalt amounted, under the contract, to almost $2,000; so that, in this case, it appears that, after the bids had all been submitted, the members of the council were advised that the lowest bidder was willing to reduce his bid to that amount by furnishing a higher grade of asphalt. It has been held that the action of the council in accepting the modified proposal was in effect a rejection of all the proposals. *Attorney General v. Public Lighting Commission* (Mich.), 118 N. W. 935–938. We are of opinion that the council had no authority, under this record, to let this contract.

We shall refer later to appellant's claim that the contract was substantially complied with. They contend that the improvement was of some value, and that the plaintiff and other property owners ought not to receive the benefit of the improvement without paying for it. It is possible, though we do not determine the point, that the statute is broad enough, had there been a valid contract, to permit a reassessment according to the benefits received by abutting property, if the improvement was of some value, even though there was not a substantial compliance with the contract authorizing the assessment of the benefits which the property would have received had it been according to the contract. But the case was not tried upon that theory in the district court. The evidence does not show how much the property was benefited

by an incomplete performance of the contract. The appellant claims that there has been a substantial compliance, entitling it to such an assessment as would have been proper had the contract been complied with.

4. It is said by appellant that, in this case, the contractors gave a guaranty bond to keep in repair and make good any defects for a period of five years from the completion and acceptance of the contract, and that

4. MUNICIPAL COR-PORATIONS: public improvements: assessments: substantial noncompliance with contract: bond: effect.

such a bond is authorized by statute; and it is said that, under this guaranty, any defect in material or workmanship was to be made good, and that, therefore, the action of the trial court in setting aside the entire assessment and canceling the same, in face of the provision quoted, is error. Conceding, for the purpose of argument, that in another lawsuit liability could be established on the bond, this does not obviate the necessity for a substantial compliance with the contract before the cost of the improvement may be assessed against abutting property.

5. It is contended by appellant that the plaintiff was present during the progress of the work and made complaint as to some of these matters, and that changes were made to meet his complaints and criticisms; that he is

5. MUNICIPAL COR-PORATIONS: public improvements: assessments: estoppel to object.

estopped from disputing the validity of the assessment, especially where the work and material are in substantial compliance with the contract.

At one point in appellant's argument, it is said that, when a part of this work was being done, it was done under the observation of the appellee, sitting on his front porch, and that changes were made to meet his objections. But, at another point in the argument, it is said that plaintiff's evidence is not credible, because he was so far away, sitting on his porch, that he could not see. They say that there is no evidence that the mixture of cement was not as specified, "except the unsupported statement of Mr. Atkinson, based on

distant observation from his front porch." It is shown that plaintiff was engaged in his ordinary avocation most of the time during the day.   At one time during the progress of the work, he objected to the material used in the foundation for the curb and gutter, which was, under the specifications, to be composed of coarse gravel of a certain size.   This is the matter before referred to, wherein an arrangement seems to have been made between one of the contractors and the city engineer.   Upon plaintiff's objection to this material, two loads were hauled away and other material substituted, which, it is claimed, did not comply with the contract.   There may be some other items about which the plaintiff had some knowledge, but it is not shown that, as to all items, or as to the work generally, plaintiff was present making objections, and that things were done to meet his complaints so as to estop him. As to some matters he could not know. This is especially true as to the thickness of the paving.

6.   It is next contended by appellant that, because the work was approved by the inspector and later accepted by the city, it is conclusive upon the lot owner.   This is the rule where there has been substantial compliance with the contract and there is no fraud.   *In re Appeal of Apple,* 161 Iowa 314, 322.   But not so where there has not been a substantial compliance with the contract.   *McCain v. City of Des Moines,* 128 Iowa 331.

6. MUNICIPAL CORPORATIONS: public improvements: substantial noncompliance with contract followed by acceptance: effect.

7.   Lastly, as to appellant's claim that there was a substantial compliance with the contract, and that, therefore, plaintiff may not escape payment.   We have referred to a number of instances where the contract was not complied with. Some of these could not be the result of mere inadvertence.   In a number of instances, there appears to have been no attempt to comply with the contract.   It is said, as to some of the matters complained of, that they were put in the same as was done with

7. MUNICIPAL CORPORATIONS: public improvements: substantial compliance with contract: evidence: sufficiency.

paving and curbing in prior years. But it appears that the specifications and the contracts were not the same as in former years. The specifications and contract in this case were more stringent, and the provisions different from those given where paving was done in prior years, some of which were by red ink interlineation, and should have been noticed by the contractors.

It is said by appellant that the fact that the curbing and paving passed through one season of freezing and thawing without being broken or cracked shows that the improvement was up to specifications and was apparently all right after a year's trial. This is hardly a fair test. The improvement is supposed to be permanent and to last for more than the one year. Furthermore, it is said by appellant that, where changes were made, the pavement was just as good as though the contract had been complied with. Some of the cases hold that the city cannot be heard to say that the original requirements in the specifications did not add any to the value of the improvement, and that a substitute was just as good. In *Littell v. Webster County*, 152 Iowa 206, 215, it was said:

" ' "Substantial performance," as defined by the cases, permits only such omissions or deviations from the contract as are inadvertent or unintentional, are not due to bad faith, do not impair the structure as a whole, are remedial without doing material damage to other parts of the building in tearing down and reconstructing, and may without injustice be compensated for by deductions from the contract price.' "

See, also, *Wingert v. City of Tipton*, 134 Iowa 97; *Henry v. Jons*, 164 Iowa 364, 366; *In re Apple*, 161 Iowa 314, 322.

At the risk of repetition, we shall refer as briefly as may be to some of the matters wherein the contract was not complied with. The foundation of the paving was not made of broken stone and of the size required by the specifications; the concrete for the curb was not placed in layers and tamped, as required by the specifications. The material was not mixed

in a dry state, as provided by the specifications, and we think from the entire record it was satisfactorily shown that the gravel, sand and cement were not in the proportion required. The provision in reference to plowing in the preparation for the subgrade for the paving, and to the use of mattocks and shovels, was not complied with, nor was the subgrade moistened before the spreading of the concrete, as required. The foundation for the paving was not of the required thickness, nor was it substantially so. The specimen of the thickness was taken from the center of the street and in the traveled portion thereof. There was no attempt to show that the average thickness of the entire pavement was as required by the specifications. Other circumstances have been referred to, and we shall not prolong the opinion to notice them further.

The writer is of opinion that contracts of this character ought to be strictly complied with, perhaps more so than under the rules heretofore announced by the court. It is recognized that, in some instances, property owners object to an assessment against their property, even where there has been full compliance with the contract, and that trivial objections are made in an attempt to defeat the assessment. It is doubtless right that, where the contractor has honestly and in good faith attempted to fully comply with his contract, and there is only some slight or unintentional defect which could be readily remedied and the cost deducted, the assessment ought to be made. On the other hand, it is well known that, in many instances, improvements of this character are not well performed and the contract and specifications are substantially ignored, at least in many particulars, and then the doctrine that there has been a substantial compliance is invoked. To use an inelegant expression, but one in more or less common use at this time, the contractor simply does enough work to try to "get by" under the rule of substantial performance. The city is the agent for the property owners. The property owners have but little, if anything, to say dur-

ing the progress of the work, and many times do not have the time or inclination to examine the work carefully as it progresses. Some of the work is not discoverable without close observation. As a matter of common honesty, such contracts ought to be strictly complied with and performed, and the city authorities should see to it that it is so.

Our conclusion is that the judgment of the district court is right, and it ought to be and is—*Affirmed.*

EVANS, C. J., DEEMER and LADD, JJ., concur.